**United States Bankruptcy Court**



District of Arizona

**TUCSON DIVISION**
James A Walsh Courthouse
38 S. Scott Avenue
Tucson, AZ 85701
520-202-7500

**YUMA DIVISION**
John M. Roll Courthouse
98 W. 1st Street, Suite 270
Yuma, AZ 85364
800-556-9230

**PHOENIX HEADQUARTERS**
230 N. First Avenue, Suite 101
Phoenix AZ 85003-1706
602-682-4000

**FILED**

MAY 0 3 2019

UNITED STATES
BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

## CREDITOR CHANGE OF ADDRESS

Case No.: 4:17-bk-01945-Bmw    Chapter: 7

Case Name: Stephanie Arlene JORDAN

**Creditor Name:** Rhonda & Daniel Matyas wife & husband

**NEW Mailing Address:** 1123 Manchester ST
Street Address/P.O. Box Number

_____
Suite/Apartment Number

National City CA 91950
City          State   Zip Code

**OLD Mailing Address:** 2345 S Alma School Rd #104
Street Address/P.O. Box Number

#104
Suite/Apartment Number

Mesa    AZ    85210-4013
City          State   Zip Code

Creditor Signature: _Rhonda Matyas_    4/29/2019
                                        Date

CreditorAddChng/2/14



**Fill in this information to identify the case:**

Debtor 1  Stephanie Arlene JORDAN

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court for the: District of Arizona

Case number  4:17-bk-01945-Bmw



FILED

MAY 0 3 2019

UNITED STATES
BANKRUPTCY COURT
FOR THE DISTRICT OF ARIZONA

Official Form 410

# Proof of Claim

12/15

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

Rhonda & Daniel Matyas *wife & husband* & Robert Klump
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Rhonda Matyas
Name

1123 Manchester ST
Number  Street

National City CA 91950
City  State  ZIP Code

Contact phone 619-259-2255

Contact email mesendu@cox.net

Where should payments to the creditor be sent? (if different)

Name

Number  Street

City  State  ZIP Code

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one):
___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___ — ___ ___ ___ ___

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____

Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. | Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____ |

7. How much is the claim? $ 69,997.62 Does this amount include interest or other charges?

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. What is the basis of the claim?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_____

9. Is all or part of the claim secured?

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property: $ _____

Amount of the claim that is secured: $ _____

Amount of the claim that is unsecured: $ _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition: $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed

☐ Variable

10. Is this claim based on a lease?

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____

11. Is this claim subject to a right of setoff?

☑ No

☐ Yes. Identify the property: _____

Official Form 410               Proof of Claim               page 2

# Interest Calculations for Proof of Claim

To quote the Judgment attached to the Proof of claim:

*"..for a total judgment of $40,238.34 with interest on that amount from the date of this judgment at the rate of ten percent per annum until the judgment is paid in full. DATED this 5th day of August, 2011"*

Following entry of the Judgment the creditors were Awarded Sanctions to quote the RECITALS attached:

*"Following entry of the Judgment, Breeders filed a Motion for Sanctions ... which the court granted...for a total of $7,194.54*

| Date | Description | Amount | Balance | |
|------|-------------|--------|---------|---|
| 8/5/2011 | Judgement Awarded | $40,238.34 | 40,238.34 | |
| 8/5/2011 | Sanctions Awarded | $7,194.54 | 47,432.88 | |
| 9/5/2011 | Interest 10% 31 days | $408.77 | 47,841.15 | |
| 9/20/2011 | Interest 10% 15 days | $196.61 | 48,037.75 | |
| 9/29/2011 | Payment | -$3,000.00 | 45,037.75 | |
| 10/5/2011 | Interest 10% 15 days | $185.09 | 45,222.84 | |
| 11/5/2011 | Interest 10% 31 days | $384.09 | 45,606.93 | |
| 11/16/2011 | Payment | -$3,000.00 | 42,606.93 | |
| 12/5/2011 | Interest 10% 19 days | $221.79 | 42,828.72 | |
| 1/1/2012 | Interest 10% 26 days | $305.08 | 43,133.80 | |
| 1/1/2013 | Interest 10% 1 year | $4,313.38 | 47,447.18 | |
| 1/1/2014 | Interest 10% 1 year | $4,744.72 | 52,191.90 | |
| 1/1/2015 | Interest 10% 1 year | $5,219.19 | 57,411.09 | |
| 1/1/2016 | Interest 10% 1 year | $5,741.11 | 63,152.20 | |
| 1/1/2017 | Interest 10% 1 year | $6,315.22 | 69,467.42 | |
| 3/2/2017 | Interest 10% 30 days | $571.20 | 70,038.62 | as of date Bankruptcy filed |
| | Adjustment * | - $68.00 | 69,997.62 | |

*The "Award" of Sanctions was granted 9/8/2011 a few days after the judgment so we reduced the balance by $68.00 which would cover a difference case the Trustee's feel there might be one.

## Balance owing by Debtor as of date of Bankruptcy: $69,947.62

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check all that apply:*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
$_____

☐ Up to $2,775* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).
$_____

☐ Wages, salaries, or commissions (up to $12,475*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).
$_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).
$_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).
$_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.
$_____

\* Amounts are subject to adjustment on 4/01/16 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  04 / 28 / 2019
                  MM / DD / YYYY

*Rhonda Matyas* (signature)
Signature

**Print the name of the person who is completing and signing this claim:**

Name     Rhonda            MATYAS
         First name    Middle name    Last name

Title    Creditor

Company  _____
         Identify the corporate servicer as the company if the authorized agent is a servicer.

Address  1123 Manchester ST
         Number    Street
         National City          CA       91950
         City                   State    ZIP Code

Contact phone  619·259·2255       Email  mesendu@cox.net

THIS ORDER IS APPROVED.

Dated: April 10, 2019



*Benda Moody*

Brenda Moody Whinery, Chief Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF ARIZONA

In re:

STEPHANIE ARLENE JORDAN,

Debtors.

(Chapter 7 Case)

No. 4:17-bk-01945-BMW

**ORDER APPROVING TRUSTEE'S STIPULATED APPLICATION FOR SETTLEMENT WITH JUDGMENT CREDITORS**

**Fed.R.Bankr.P. 9019**

After thorough consideration of the *Trustee's Stipulated Application for Approval of Settlement with Judgment Creditors* ("**Stipulation**") filed by Stanley J. Kartchner, Chapter 7 Trustee ("**Trustee**") regarding Daniel and Rhonda Matyas and Robert Klump (collectively referred to as "**Judgment Creditors**"), and good cause appearing therefor;

**THE COURT FINDS** that the settlement is in the best interest of the Estate, that the settlement has been duly noticed, with no objections having been received and all other requirements of Bankruptcy Rules 9019 and 2002 having been satisfied;

**IT IS HEREBY ORDERED** approving the Stipulated Application and authorizing the Trustee to settle the Estate's interest in the Judgment Lien, as that terms is defined in the Stipulated Application, based on the terms set forth therein.

**IT IS HEREBY ORDERED** that the Judgment Lien is avoided pursuant to 11 U.S.C. § 544(a), the avoided Judgment Lien is property of the Estate pursuant to 11 U.S.C. § 550, and the avoided Judgment Lien shall be preserved for the benefit of the Estate pursuant to 11 U.S.C. § 551.

Lane & Nach, P.C.
2001 E. Campbell Ave., Suite 103
Phoenix, AZ 85016

**IT IS FURTHER ORDERED** that within thirty (30) days of this Order approving the Stipulated Application, Judgment Creditors shall be permitted to file an unsecured, non-priority proof of claim for the full amount of the avoided Judgment Lien due and owing, without prejudice, to the Trustee reviewing same.

**IT IS FURTHER ORDERED** that upon the filing of an unsecured, non-priority proof of claim by Judgment Creditors within thirty (30) days of the Order approving this Stipulated Application, said proof of claim shall be deemed timely filed within the meaning of Fed.R.Bankr.P. 3002(c).

**IT IS FURTHER ORDERED** that upon entry of this Court's Order, Trustee shall be entitled to record the Order with the Office of the County Recorder for Pinal County.

**SIGNED AND DATED ABOVE**

Rhonda & Daniel Matyas
Robert Klump
1123 Manchester ST
National City, CA 91950
619-259-2255
mesendu@cox.net

April 30, 2019

Bankruptcy Court District of Arizona
230 N 1st AV #101
Phoenix, AZ 85003-1706

Re: Proof of Claim and Address Change for Creditor
    Bankruptcy Case 4:17-bk-01945-BMW for Debtor: Stephanie Arlene Jordan

To whom it may concern,

Enclosed for submission to the courts are:

2 pages of this cover page outlining enclosures pg1 & pg 2

3 pages Creditor Proof of Claim Forms 410
        Accompanying those pages are
        1 page Interest Accounting Sheet
        1 Self Addressed stamped envelope with additional pages of the above to
        have courts return as proof of receipt

2 pages Order Approving Trustee's Stipulated Application for Settlement
        With Judgment Creditor

Page 1 of Cover Page

1 page form 309A Notice of Chapter 7 Bankruptcy

16 pages of Judgment awarded to Creditors 08/05/2011

Page 1 of Cover Page

3 pages Proof of Court Awarded Sanctions 098/08/2011
    3 pages of Docket Code 023 pgs 1-3
    2 pages of Settlement Agreement with Debtors approval of Award
     Page1 outlining amount & page 3 signatures

4 pages of renewal of above Judgment

2 pages Address Change for Creditors one each for Matyas and Klump
    Attached to those 2 pages are confirmation proof of prior address:
    1 page copy of return to Sender
    3 pages Withdrawal of Attorney

Please fill these forms with the courts and return in self addressed envelope the items enclosed as proof of receipt.

Please feel free to call with any questions or concerns.

Respectfully


_____ Rhonda Matyas  4/30/2019


_____ Daniel Matyas  4/30/2019


_____ Robert Klump  4/30/2019


Page 2 of Cover Page

1   **Thomas N. Swift II, P.C.**
    **Thomas N. Swift, 006495**
2   **Attorney at Law**
    **2345 S. Alma School Road, Sui**
3   **Mesa, Arizona 85210-4013**
    **(480) 897-1700/Fax (480) 897-1⎽⎽**
4   **Email: tnswift@azbar.org**

5   Attorney for Defendants

6

                    IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
7
                        IN AND FOR THE COUNTY OF MARICOPA
8

9   CARL JAMES DOUGLAS and STEPHANIE ) No. CV2009-024481
10  JORDAN, husband and wife,          )
                                       )
11              Plaintiff,             )
                                       )
12      vs.                            )      APPLICATION FOR PERMISSION TO
                                       )      WITHDRAW AS ATTORNEY FOR
13  RHONDA MATYAS and DANIEL MATYAS,   )      D E F E N D A N T S / C O U N T E R -
    wife and husband; ROBERT KLUMP and JANE ) CLAIMANTS
14  DOE KLUMP, husband and wife; JOHN and )
    JANE DOES I-X; ABC CORPORATIONS I-X; )   (Assigned to The Honorable Michael
15  and XYZ PARTNERSHIPS I-X,          )      Harrod)
                                       )
16              Defendants.            )
                                       )
17  ────────────────────────────────── )
    RHONDA MATYAS and DANIEL MATYAS,   )
18  wife and husband; ROBERT KLUMP,    )
                                       )
19              Counterclaimants,      )
                                       )
20      vs.                            )
                                       )
21  CARL JAMES DOUGLAS and STEPHANIE   )
    JORDAN, husband and wife,          )
22                                     )
                                       )
23              Counterdefendants.     )
                                       )
24

25          Thomas N. Swift hereby applies for permission to withdraw as attorney of record for

26  Defendants/Counterclaimants Rhonda Matyas, Daniel Matyas, and Robert Klump. Permission to

27  withdraw is requested because Defendants/Counterclaimants have terminated Applicant's services. The

28                                          1

name, residence and telephone number of the Defendants/Counterclaimants is as follows:

Rhonda Matyas and Daniel Matyas, 3827 East Marilyn, Phoenix, Arizona 85032 (602/795-7999)

Robert Klump, 3827 East Marilyn, Phoenix, Arizona 85032 (602/795-7999)

This Application bears the written approval of Defendants/Counterclaimants. Accordingly, the Application is presented ex parte. Upon the entry of the order authorizing the withdrawal of Applicant, Applicant will give prompt notice of entry of such order to all other parties or their attorneys.

DATED this *18th* day of October, 2012.

THOMAS N. SWIFT II, P.C.

/s/ Thomas N. Swift
Thomas N. Swift
2345 South Alma School Road
Suite 104
Mesa, Arizona 85210-4013
Attorney for Defendants/Counterclaimants

2

# CONSENT TO WITHDRAWAL OF ATTORNEY

The undersigned hereby consent to the withdrawal of Thomas N. Swift as their attorney of record in *Carl James Douglas et ux. v. Rhonda Matyas et ux, et al.*, Maricopa County Superior Court Case No. CV2009-024481.

Rhonda Matyas
3827 East Marilyn
Phoenix, Arizona 85032
(602/795-7999)

Daniel Matyas
3827 East Marilyn
Phoenix, Arizona 85032
(602/795-7999)

Robert Klump
3827 East Marilyn
Phoenix, Arizona 85032
(602/795-7999)

3

PRESORTED
FIRST-CLASS MAIL
POSTAGE & FEES PAID
UNITED STATES COURTS
PERMIT NO. G-18

**OFFICIAL BUSINESS**
UNITED STATES BANKRUPTCY COURT
PENALTY FOR PRIVATE USE, $300
**CONTAINS NOTICE of a PROCEEDING**
in the
**UNITED STATES BANKRUPTCY COURT**

# FIRST-CLASS MAIL

NOTIFY SENDER OF NEW ADDRESS
: THOMAS N SWIFT II PC
4701 S LAKESHORE DR STE 2
TEMPE AZ 85282-7169

BC: 85282716902     *4138-00355-09-31

85282>7169

*Proof of Prior Address*

FRI-56604 0970-4 pdf001 17-01945
ALAN R. SOLOT
2701 E. Speedway STE 203
TUCSON, AZ 85716

019039  19039 1 AB 0.409  85210  9 2  8757-1-19039

Rhonda and Daniel Maytas, Robert Klump
c/o Thomas N. Swift II, PC
2345 S Alma School Rd Ste 104
Mesa, AZ  85210-4013

# ATTENTION: ADDRESS CORRECTION REQUESTED

If you are receiving this notice, U.S. Postal Service records indicate that the address that the *debtor* listed
is subject to a forwarding order.  Forwarding orders are only good for a limited time.

| IF YOU ARE THE INTENDED NOTICE RECIPIENT | IF YOU ARE THE DEBTOR/DEBTOR'S COUNSEL |
|---|---|
| 1.  Update your address immediately with the Bankruptcy Court identified on the notice pursuant to the Court's local procedures. <br> 2.  You may sign up for electronic noticing at http://bankruptcynotices.uscourts.gov or <br> 3.  You may register a preferred physical address at http://bankruptcynotices.uscourts.gov <br> Enter all variations of your name and address(es) that you want redirected to your electronic or preferred physical address.  Make sure that you enter the name and address that were on this notice to ensure that future notices to this incorrect address will be re-directed. | 1.  Find an updated address and send the attached document to that address. <br> 2.  Update the address with the Bankruptcy Court pursuant to the Court's local procedures. |

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20160481502  07/08/2016  02:5⌓
KIOSK RECORDING

0575856-3-1-1
knucklesa

Renewal
of
Judgment

AFFIDAVIT FOR RENEWAL OF JU⌓

# DO NOT REMOVE

# This is part of the official document

## Maricopa County
## Recorders Office

**111 S. 3rd Avenue**
**Phoenix Arizona 85003**
**(602) 506-3535**

| Confirmation # | 21913 |
|---|---|

DANIEL MATYAS
1123 MANCHESTER ST
NATIONAL CITY, CA 91950
6194346608

| Credit Card | Recordation Date Friday, July 08, 2016 2:53 PM | Sequence 20160481502 Thru 20160481502 |
|---|---|---|

| Qty | Description | Unit Price | | Total Price |
|---|---|---|---|---|
| 1 | BASE | 5.00 | | 5.00 |
| 1 | SURCHARGE | 4.00 | | 4.00 |
| | | | | |
| | | | | 9.00 |
| | | | | 9.00 |
| | | | | 0.00 |

The copies you have purchased will be mailed to you by the Recorders Office within two business days of

| Seq # | Document Description | Requested |
|---|---|---|
| 20160481502 | AFFIDAVIT FOR RENEWAL OF JUDGMENT | No |



## County Recorder
## Helen Purcell

To Read the KIOSK Memorandum of
Understanding in its entirety, please visit
at:
**www.MOU.Maricopa.GOV**

Documents Submitted By:   DANIEL MATYAS
Documents Recorded By:    knucklesa



# Maricopa County ~~Justice~~ Courts, Arizona

Please select court from the drop down list ----------

CASE NUMBER: CV2009-024481

Daniel Matyas, Rhonda Matyas, Robert Klump Carl J Douglas & Stephanie Jordan
5122 E. Nisbet Rd.
Scottsdale Az. 85254
(619) 434-4608
**Plaintiff(s) Name / Address / Phone**

14225 N. River Ridge Road
Coolidge Az. 85228
(623) 695-4097
**Defendant(s) Name / Address / Phone**

Thomas N. Swift
Thomas N. Swift II, PC
23455 Ahwa School Rd. S. 104 Mesa Az 85210-4013
(623) 322-1416
**Attorney for Plaintiff(s) Name / Address / Phone**

Fitzgibbons Law Office, PLC
P.O. Box 11208
Casa Grande Az 85230-1208
(623) 695-0278
**Attorney for Defendant(s) Name / Address / Phone**

---

## AFFIDAVIT FOR RENEWAL OF JUDGMENT

ARS 12-1612

The Judgment Creditor is the ☑ Plaintiff ☐ Defendant ☐ An Assignee

I am the Judgment Creditor in this matter, or I am authorized by the judgment creditor to make this affidavit. The following statements are true. All computations made are validated in the statement of cost.

1. On 12 Sept, 2011 _(date of judgment)_ Judgment Creditor recovered judgment against the above named debtor for the sum stated on the judgment, plus interest.

2. No execution is anywhere outstanding or unreturned upon the judgment.

3. Any setoffs are stated below:

$ 40,238.34 Original Judgment

$ 21,396.34 Accrued interest from date of judgment

$ _____ Accrued court costs

$ _____ Less setoffs, if any

$ 61,635.08 Total sum due

MICHAEL K. JEANES
Clerk of the Superior Court
By JACKIE URTIZ, Deputy
Date 07/08/2016 Time 12:15:07
Description                    Amount
------ CASE# CV2009-024481 ------
MISC.SVC/EXPRES MAIL            27.00
TOTAL AMOUNT                    27.00
Receipt# 25350694

4. All computations have been made as set forth in the statement of cost.

I state under penalty of perjury that the foregoing is true and correct.

Date: 7-8-2016 _____

☑ Plaintiff ☐ Defendant ☐ Assignee

---

## NOTICE OF RENEWAL OF JUDGMENT

On_____ the court docketed an Affidavit of Renewal of Judgment by the judgment creditor herein.

The judgment has been renewed for a period of five (5) additional years. The expiration date of this renewal is five (5) years from the date of docketing (ARS 12-1613). The expiration date is: _____

Date: _____
_____
Justice of the Peace

---

| I CERTIFY that I delivered / mailed a copy of this document to: |
| --- |
| ☐ Plaintiff at the above address  ☐ Plaintiff's attorney  ☐ Defendant at the above address  ☐ Defendant's attorney |
| Date: _____ By _____ |
| Clerk |

CV 8150-139 R: 1/1/13



When recorded return to:
Thomas N Swift II, P.C.
2345 S Alma School Rd
STE 104
MESA, AZ 85210



**OFFICIAL RECORDS OF
PINAL COUNTY RECORDER
LAURA DEAN-LYTLE**

DATE/TIME: 09/06/2011 1313
FEE: $24.00
PAGES: 16
FEE NUMBER: 2011-073404



(The above space reserved for recording information)

JUDGMENT

## DOCUMENT TITLE

Judgment

DO NOT DISCARD THIS PAGE. THIS COVER PAGE IS RECORDED AS PART
OF YOUR DOCUMENT. THE CERTIFICATE OF RECORDATION WITH THE FEE
NUMBER IN THE UPPER RIGHT CORNER IS THE PERMANENT REFERENCE
NUMBER OF THIS DOCUMENT IN THE PINAL COUNTY RECORDER'S OFFICE.

Form RE-49

## INFORMATION STATEMENT OF JUDGMENT CREDITOR

The judgment creditor named below hereby provides the following Information Statement in accordance with A.R.S. §33-967.

1.      The correct name and last known address of each judgment debtor and the address at which each judgment debtor received the Summons by personal service or by mail: **Carl J. Douglas and Stephanie Jordan, 14225 North River Ridge Road, Coolidge, Arizona 85228**, *address at which service accomplished:* N/A

2.      The name and address of the judgment creditor:  **Daniel Matyas, Rhonda Matyas and Robert Klump, 5122 East Nisbet Road, Scottsdale, Arizona 85254**

3.      The amount of the judgment as entered or as most recently renewed:  $40,238.34

4.      If the judgment debtor is a natural person, the judgment debtor's social security number, date of birth and driver license number:  Not known.

5.      Whether a stay of enforcement has been ordered by the Court and the date the stay expires:      [ ] Yes      [ X ] No      Date Expires: N/A

DATED this _2nd_ day of September , 2011.

THOMAS N. SWIFT II, P.C.

*Thomas N Swift*

Thomas N. Swift
2345 South Alma School Road
Suite 104
Mesa, Arizona 85210-4013
Attorney for Judgment Creditor

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

# IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| CARL JAMES DOUGLAS and STEPHANIE JORDAN, husband and wife, | No. CV 2009-024481 |
| Plaintiffs, | **FINDINGS OF FACT, CONCLUSIONS OF LAW AND JUDGMENT** |
| vs. | |
| RHONDA MATYAS and DANIEL MATYAS, wife and husband; ROBERT KLUMP and JANE DOE KLUMP, husband and wife; JOHN and JANE DOES I-X; ABC CORPORATIONS I-X; and XYZ PARTNERSHIPS I-X, | |
| Defendants. | |
| RHONDA MATYAS and DANIEL MATYAS, wife and husband; ROBERT KLUMP, | |
| Counterclaimants, | Assigned to the Hon. Gary Donahoe |
| vs. | |
| CARL JAMES DOUGLAS and STEPHANIE JORDAN, husband and wife, | |
| Counterdefendants. | |

This matter was tried to the Court, sitting without a jury, on May 10, 11 and 12, 2011. Plaintiffs/Counterdefendants were represented by counsel, David A. Fitzgibbons III. Defendants/Counterclaimants were represented by counsel, Thomas N. Swift.

Pursuant to the parties' stipulation, the Court provided counsel a draft ruling on May 17, 2011. On May 31, 2011, counsel presented closing arguments. The Court has considered the testimony of the witnesses, all the trial exhibits, Plaintiffs' post-trial memorandum and counsels' closing arguments. The Court also has considered Defendants' Application for Award of Attorney's Fees, Plaintiffs' response, Defendants' reply, Plaintiffs' Statement of Costs and Notice of Taxation of Costs, Defendants' objection and Defendants' Statement of Costs and Notice of Taxation of Costs.

1

The Court, as the trier of fact, has considered the demeanor of the witnesses in assessing their credibility. As the trier of fact, the Court may accept or reject, in whole or in part, the testimony of any witness and the opinions of any expert witness. *See* RAJI (Civil) 4th Preliminary Instructions 3, 5 and 6.

## I. Findings of Fact

1. Defendants/Counterclaimants Rhonda Matyas ("Rhonda"), Daniel Matyas and Robert Klump (collectively, the "Breeders") breed Portuguese Water Dogs.

2. On September 27, 2007, Plaintiffs/Counterdefendants Carl James Douglas and Stephanie Jordan ("Stephanie" or collectively as "Plaintiffs") purchased a female Portuguese Water Dog puppy -- subsequently named "Slipper" -- from Breeders. Slipper was born on July 25, 2007. Breeders and Stephanie signed a "Puppy Sales Pet Contract" on a form prepared by Breeders in connection with the sale. *See* Exhibit 5. Stephanie paid Breeders $2,000.00 for Slipper. Slipper was sold without breeding rights. Slipper was purchased as a family pet for Plaintiffs and their then six-year-old daughter, Paige.

3. While testimony was presented regarding Paige's reactions to the events in question, Paige is not a named Plaintiff.

4. Prior to purchasing Slipper, Stephanie completed a Questionnaire provided by Breeders. *See* Exhibit 25. Among other things, the Questionnaire asked what other pets the buyer had and whether those pets had been spayed or neutered. In her response to the Questionnaire, Stephanie disclosed that she had three dogs, two of which had not been neutered. The question and response is set forth below:

    Are your pets spayed/neutered? Please specify which one(s). *The Fox Terrier and one of the mixed breed dogs are not neutered. I can though.*

5. Prior to the purchase of Slipper, Breeders did not perform a home inspection of Plaintiffs' residence.

6. Slipper was registered with the American Kennel Club. Breeders were the registered owners of the dog. The Pet Contract provides that the AKC papers would be held in Breeders' name until such time as Slipper was spayed.

7. Slipper was spayed by Dr. Audie Wood, DVM, on March 10, 2008.

8. On multiple occasions prior to trial, Breeders were provided proof that Slipper had been spayed. On the morning of the third day of trial, May 12, 2011, Breeders delivered to Plaintiffs' counsel the signed AKC papers for Slipper.

9. In the Fall of 2007, Breeders were contemplating a relocation to California and were looking for a good home to house their dogs Dunna and Einey. Dunna and Slipper are sisters. Einey is their mother. Breeders intended to breed Dunna. Breeders were looking for someone to care for and house Dunna until Breeders wished to breed Dunna. Breeders would then retrieve Dunna for the breeding and after puppies were born, return the dog to the caregiver. Once the dog would no longer be bred, the caregiver would be entitled to keep the dog.

2

10. Stephanie contacted Rhonda and asked if Breeders were still looking for homes for other puppies or dogs. On November 5, 2007, Breeders delivered Dunna and Einey to Stephanie. Einey was a mature female when delivered to Plaintiffs; Dunna was not because, like Slipper, Dunna was not yet four months old.

11. At the time Dunna was delivered, Stephanie and Breeders signed an agreement prepared by Breeders entitled "Pet Lease Sales Contract". *See* Exhibit 6. Stephanie paid Breeders the sum of $1.00 in connection with the Pet Lease Sales Contract. Under the Pet Lease Sales Contract, all breeding rights for Dunna were retained by Breeders.

12. Einey did not last long at Plaintiffs' residence. A few days after arriving, Einey ran from Plaintiffs' home. Einey was recovered, and Breeders took possession of Einey. Dunna stayed with Plaintiffs.

13. After November, 2007, Breeders did not see Dunna again until January 20, 2009.

14. On March 3, 2008, Stephanie advised Breeders that Dunna "is in heat." *See* Exhibit 8, p. 7. In response, Rhonda inquired whether Plaintiffs' male dogs had been neutered. Stephanie advised that "all the male dogs are intact," but that the only male dog capable of mating with Dunna "isn't feeling well." Stephanie also advised Rhonda that "the yard gates have been fixed so I have been putting them into the yard and locking the gates."

15. The male dogs at Plaintiffs' residence were not neutered. Red Dog, one of Plaintiffs' dogs, impregnated Dunna after Dunna escaped from the pool area when a tile worker opened the unlocked gate. On October 28, 2008, Dunna gave birth to a litter of four mixed breed puppies. Stephanie gave three of the puppies away and kept one.

16. The four mixed breed puppies had no monetary value.

17. Stephanie testified that she informed Breeders of the pregnancy of Dunna and the birth of the puppies in a telephone conversation on January 13, 2009. Breeders claim that they were not aware of the pregnancy and puppies until January 20, 2009.

18. On January 20, 2009, Breeders picked up Dunna and Slipper with the consent of Stephanie in order to have annual eye examinations conducted on the dogs. By prior agreement, the dogs were to be kept by Breeders for one week to undergo the eye exam and a worming program.

19. When Breeders picked up Dunna on January 20, 2009, Stephanie advised them that Dunna had two bite marks, likely caused by a javelina. On January 21, 2009, the bite marks were assessed as "resolving."

20. Prior to January 20, 2009, Dunna had been seen three times by Stephanie's veterinarian because Dunna was suffering from allergies that were causing her eye and skin problems. The treatment prescribed by Dr. Wood was continued by Breeders' veterinarian. Breeders did not call their vet to testify, but the record of Dunna's visit on January 21, 2009 does not support Breeders' claim of mistreatment. Dunna had on-going issues with allergies and resolving bite marks. Overall, though, Dunna was in good physical condition. However, she was not in show condition primarily because of the condition of her coat.

21. When the dogs were not returned on January 27, 2009, Stephanie sent Rhonda an email the following day wondering if she had the dates wrong because she thought the dogs

Test

would be returned on the 27th and asking why there was a delay. Rhonda did not respond.

22. On February 2, 2009, Stephanie sent Rhonda another email stating that she had received no response to her emails or phone calls and that she thought arrangements needed to be made to return Slipper the following day. Rhonda did not respond.

23. On February 4, 2009, Stephanie sent Rhonda an email stating that Rhonda had been avoiding her and that Stephanie was contacting the sheriff that day to submit a report of felony theft of Slipper.

24. The Sheriff intervened and on February 5, 2009, the Sheriff obtained Slipper from Breeders at their residence and delivered Slipper to Plaintiffs.

25. After Slipper was retrieved by the Sheriff's deputy, Rhonda sent Stephanie two emails on February 5, 2009, the first at 1:07 p.m. and the second at 7.15 p.m. *See* Exhibit 8, p. 33. In the second email, Rhonda threatened to alert "the municipalities * * * to make certain animals are cared for."

26. Rhonda followed up on the threat by reporting Plaintiffs to Pinal County Animal Control on two occasions. The first visit by an Animal Control Officer took place on February 18, 2009 and found "no problems with the health and welfare of the dogs." *See* Exhibit 11.

27. The second visit was on July 1, 2010. The animal control officer testified that she inspected the Plaintiffs' home and the dogs' kennels and found that the dogs were in excellent condition and the indoor kennels were immaculate.

28. None of Rhonda's allegations that Plaintiffs were not properly caring for their dogs were ever confirmed by Animal Control nor was there any credible evidence presented at the trial to support those allegations.

29. Breeders retained possession of Dunna. Breeders placed Dunna with caregivers in San Diego.

30. Dunna had two litters of pure bred Portuguese Water Dogs. Breeders decided not to breed Dunna a third time because Dunna did not recover very well from the last pregnancy due to prolonged post-delivery bleeding. There was no credible evidence that the problem was the result of the accidental pregnancy. However, the Court finds that Dunna had the capacity to have only three litters of puppies.

31. On February 28, 2011, Dunna ran away from Defendant/Counterclaimant Robert Klump during a rest stop on a trip from Phoenix to San Diego near I-8 and the Colorado River at Winterhaven. Breeders did not report the dog missing to the American Kennel Club (AKC), Portuguese Water Dog Club of America (PWDCA), Petrac or the local police. Dunna has an imbedded microchip, but as of this date Dunna has not been returned and is presumed lost. Dunna was three years seven months old when lost. Breeders retain possession of Einey. Einey recently had her fourth litter of pure bred Portuguese Water Dogs.

32. During the trial, Breeders voluntarily dismissed Count II (Conversion) of their Counterclaim.

4

## II. Conclusions of Law

### A. Spoliation of Evidence

Plaintiffs contend that the Court should dismiss Breeders' damage claim because of the loss of Dunna. Plaintiffs argue that because Dunna was lost, Plaintiffs were deprived of the right to have her examined by Plaintiffs' expert to determine her breedability. For the reasons stated below, the Court is of the opinion that Arizona law does not support the sanction requested by Plaintiffs nor were Plaintiffs prejudiced in presentation of their case by the loss of Dunna.

Arizona case law on spoliation of evidence is not extensive. In *Souza v. Fred Carries Contracts, Inc.*, 191 Ariz. 247, 955 P.2d 3 (App. 1997), the trial court's dismissal of plaintiff's action because of an "unintentional destruction of relevant evidence after suit ha[d] been filed" was reversed. *Id.* at p. 249. The court noted that trial court's have discretion to tailor the appropriate sanction for destruction of evidence after considering the degree of fault ranging "from innocence through the degrees of negligence to intentionality," whether the destruction was in violation of a court order or abuse of discovery or disclosure procedures or requirements, whether the complaining party played a role in the failure to preserve the evidence, the impact of the destruction on the complaining party's ability to put on its case or was irreparably prejudiced by the destruction, and giving consideration to alternative sanctions short of dismissal.

In *Smyser v. City of Peoria*, 215 Ariz. 428, 160 P.3d 1186 (App. 2007), the court addressed the issue of when it is appropriate to give a spoliation jury instruction. The factors addressed by the court were (1) the importance of the lost evidence to the complaining party's case (*see* ¶ 35), (2) whether the information from the lost evidence could be reconstructed from other available evidence (*see* ¶ 35), and (3) the *Souza* factors of the cause of the loss (innocent failure to preserve up to intentional destruction) and prejudice to the complaining party's ability to challenge the opposing party's expert's opinions (*see* ¶ 36).

Like *Smyser*, in *Strawberry Water Co. v. Paulsen*, 220 Ariz. 401, 207 P.3d 654 (App. 2008), the court addressed whether a spoliation jury instruction should have been given. In affirming the trial court's decision not to give "an adverse inference instruction based on the spoliation of evidence," the court wrote:

> Shortly after discovering the pipe feeding the Paulsens' pond, Strawberry cut out a two-foot piece of the pipe, conducted a five-minute flow test using an isolation valve and a flow meter, and later disposed of both the pipe and the meter. The Paulsens do not establish that they were prejudiced in any meaningful way by the loss of this evidence. Although they argue that they could not check the accuracy of Strawberry's flow test, they were able to voice this credibility concern to the jury through their own experts. Moreover, the

5

remaining pipeline was still available for the Paulsens to conduct their own tests.[FN17] Therefore, the trial court did not abuse its discretion.

FN17. The Paulsens' reliance on *Souza v. Fred Carries Contracts, Inc.,* 191 Ariz. 247, 955 P.2d 3 (App.1997), is unhelpful. *Souza* discusses factors related to when a party's willful destruction of evidence makes dismissal an appropriate sanction. *Id.* at 249-52, 955 P.2d at 5-8. We do not find that case applicable here.

220 Ariz. at p. 411, ¶ 30, 207 P.3d 664.

While Plaintiffs have their own beliefs about the loss of Dunna, there was no evidence that Breeders intentionally lost Dunna or that they lost Dunna in order to avoid having her examined by Plaintiffs' expert. The evidence was that Dunna simply escaped from Mr. Klump when he was trying to put a leash on her while also trying to control another dog. At most, Mr. Klump was negligent in the way he handled the dogs, but there was no evidence that the loss of Dunna was willful or intentional.

Plaintiffs also failed to establish that the presentation of their case was prejudiced in any meaningful way. Ms. Rimmer testified that the purpose of the proposed examination was to have Dunna's hips measured to obtain an OFA score. It turns out that Dunna previously had her hips measured and had an OFA score yielding a rating of "good." Also, it was uncontested that Dunna was capable of having puppies. She had three litters of puppies before she ran away.

**B. Did Breeders convert Slipper and/or Dunna and, if so, what damages were sustained by Plaintiffs?**

Plaintiffs' Complaint alleges one cause of action – conversion. "Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Miller v. Hehlen,* 209 Ariz. 462, ¶ 34, 104 P.3d 193, 203 (App. 2005), *quoting* Restatement (Second) of Torts § 222(A)(1) (1965). "To maintain an action for conversion, a plaintiff must have had the right to immediate possession of the personal property at the time of the alleged conversion." *Case Corp. v. Gehrke,* 208 Ariz. 140, ¶ 11, 91 P.3d 362, 365 (App. 2004).

By failing to return Slipper on January 27, 2009, Breeders intentionally exercised control over a dog owned by Plaintiffs. There is nothing in the Puppy Sales Contract that gave Breeders the right to take or retain Slipper absent the permission of Plaintiffs. Plaintiffs consented only to Breeders keeping Slipper until January 27, 2009.

Plaintiffs contend that they are entitled to at least nominal damages as a result of Breeders keeping Slipper for nine days. In *Focal Point, Inc. v. U-Haul Co. of Arizona, Inc.,* 155 Ariz. 318, 319-320, 746 P.2d 488, 489-490 (App. 1986), the court discussed the evolution of Arizona law, particularly the "serious interference" component of conversion, and wrote:

However, more recently, Division 2 expanded the *Shartzer* definition by adopting the position enunciated in the Restatement (Second) of Torts §

6

222(A)(1) (1965). *Mobile Discount Corp. v. Schumacher*, 139 Ariz. 15, 676 P.2d 649 (App. 1984). Section 222(A)(1) defines conversion as:

> An intentional exercise of dominion or control over a chattel which so *seriously interferes* with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel (emphasis added).

As can be seen, the Restatement definition of conversion adds the element of serious interference to the simpler definition set forth in the prior case law. In our opinion, the adoption by Division 2 of the Restatement definition of conversion is a correct summation of Arizona law on the subject. *See Huskie v. Ames Bros. Motor & Supply Co.*, 139 Ariz. 396, 678 P.2d 977 (App. 1984) [FN2]

> FN2. *Huskie* was decided in Division 1. The court cites § 223(A) as additional source material supporting the *definition* of conversion outlined in *Sterling Boat Co. v. Arizona Marine, Inc.*, 134 Ariz. 55, 653 P.2d 703 (App.1982). This citation, however, is apparently incorrect, and should read § 222(A). Restatement (Second) of Torts Appendix (1986).

Historically, tort law has drawn a distinction between mere interference with the chattel, and the "exercise of defendant's hostile control over it." Restatement (Second) of Torts § 222(A), Comment a, (1965), citing *Fouldes v. Willoughby*, 8 M. & W. 540, 151 Eng.Rep. 1153 (1841). The basis for this distinction lies in the recognition that there are degrees of interference with property. This is reflected in the measure of damages assessed as a result of the interference. To determine the seriousness of the interference we take the following factors into account: (1) the extent and duration of U–Haul's alleged exercise of dominion or control; (2) U–Haul's alleged intent to assert a right in fact inconsistent with Focal Point's right of control; (3) the extent and duration of the resulting interference with Focal Point's right of control; (4) damage done to the truck and its contents; and, (5) the inconvenience and expense caused to Focal Point. Restatement (Second) of Torts § 222(A)(2) (1965). [Fn 3 omitted.]

As noted, Breeders kept Slipper for an additional nine days. Breeders intentionally kept Slipper until the Sheriff intervened. Breeders had no right to keep Slipper. There is no other way to describe Breeders' conduct than they exercised "hostile control" of Slipper. While in Breeders' possession, Slipper sustained no injury. Plaintiffs were forced to get law enforcement involved to retrieve Slipper and Plaintiffs' daughter was upset by the events because Slipper was her pet. After Slipper was returned to Plaintiffs, Rhonda embarked on a vindictive course of conduct of reporting Plaintiffs to Animal Control. That can only be seen as a continuing effort by Rhonda to interfere with Plaintiffs' enjoyment and possession of Slipper. In the Court's opinion, these factors when considered *in toto*, particularly the facts that Slipper was a family pet, Breeders' conduct was willful and continued even after the dog was returned to her owners, and was without any legal justification, do amount to such a

7

serious interference with Plaintiffs' right to possession of Slipper to warrant an award of damages. Plaintiffs are awarded $2,000.00 which will be offset against the amount the Court awards Breeders for their damages.

Whether Breeders converted Dunna depends on whether Breeders were entitled to terminate the contract as of January 20, 2009. As discussed below, the Court is of the opinion that Breeders were entitled to terminate the contract and, therefore, Breeders did not convert Dunna.

C. **Did Plaintiffs and/or Defendants breach the Pet Lease Sales Contract? If so, what damages are they entitled to recover?**

The "Pet Lease Sales Contract" regarding Dunna contains the following provision:

Each party has availed themselves with the right to seek legal counsel and has satisfied themselves that this agreement is correct and accurately reflects the understandings of the parties, and specifically waves [sic] the right to challenge this agreement due to failure to seek legal counsel. The agreement terminates and supercedes [sic] all prior understandings or agreements on the subject manner hereof. Only a further writing, that is duly executed by both parties, can modify this agreement.

Under the specific terms of the contract, Plaintiffs became owners of the dog and Breeders retained the rights to breed the dog and own all puppies. Breeders contended that there was an agreement between the parties that Breeders also retained the right to show the dog and, therefore, they were entitled to keep her in order to get her in show condition. Without objection from either party, parol evidence was offered in an effort to support Breeders contention that the parties intended that Breeders' rights included not only breeding, but also showing Dunna.

The above clause is commonly known as an integration clause. In *Taylor v. State Farm Mut. Auto. Ins. Co.*, 175 Ariz. 148, 154, 854 P.2d 1134, 1140 (1993), our supreme court addressed the parol evidence rule when such evidence is offered to interpret the specific terms of a contract and wrote:

The better rule is that the judge first considers the offered evidence and, if he or she finds that the contract language is "reasonably susceptible" to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties.

The *Taylor* court also noted that the parol evidence rule bars the introduction of evidence of prior negotiations to "vary or contradict" the terms of the written agreement. *See* 175 Ariz. at 152, 854 P.2d at 1138. Where the contract contains an integration clause, the clause generally prevents consideration of evidence of earlier negotiations that might tend to modify the clear terms of the agreement. *See* 6 Arthur L. Corbin, *Corbin On Contracts* § 578 (2002).

8

Following the approach in *Taylor*, this Court has considered all the parol evidence to determine whether the terms of the agreement were reasonably susceptible to an alternative interpretation as advanced by Breeders that they had the right to keep the dog for the purpose of showing her. Having considered both the contract language and the parol evidence the Court finds and concludes as a matter of law that the contract is not ambiguous. The Breeders did not retain the right to show the dog. There is no provision in the contract allowing the Breeders to take the dog to show it and there was no subsequent written agreement giving Breeders that right. Breeders included an integration clause in the contract to avoid the problem of one party claiming rights to the dog that were not expressly provided for in the contract. Breeders drafted the contract and did not reserve to themselves the right to show the dog.

However, that does not end the analysis because Breeders contend that as a result of Plaintiffs' conduct, Breeders had the right to terminate the agreement and keep Dunna. In *Bike Fashion Corp. v. Kramer*, 202 Ariz. 420, 423-424, ¶ 13-14, 46 P.3d 431, 434-435 (App. 2002), the court wrote:

> Arizona "law implies a covenant of good faith and fair dealing in every contract." *Rawlings v. Apodaca*, 151 Ariz. 149, 153, 726 P.2d 565, 569 (1986); see *Enyart v. Transamerica Ins. Co.*, 195 Ariz. 71, 76, 985 P.2d 556, 561 (App.1998); *Diagnostic Lab. v. PBL Consultants*, 136 Ariz. 415, 419, 666 P.2d 515, 519 (App.1983). "[I]mplied terms are as much of a contract as are the express terms." *Wells Fargo Bank v. Arizona Laborers, Teamsters & Cement Masons Local No. 395 Pension Trust Fund*, 201 Ariz. 474, 490 ¶ 59, 38 P.3d 12, 28 (2002). The purpose of such terms is so "neither party will act to impair the right of the other to receive the benefits which flow from their agreement or contractual relationship." *Rawlings*, 151 Ariz. at 153-54, 726 P.2d at 569-70. This obligation "preserve[s] the spirit of the bargain rather than the letter" and guarantees the protection of the parties' reasonable expectations, such being "the basic purpose of contract law." 3A CORBIN ON CONTRACTS § 654A at 105 (Lawrence A. Cunningham & Arthur J. Jacobson eds., Supp.1999).

> The law on the relationship between a contract's express terms and the implied covenant of good faith and fair dealing is turbid. The general rule is that an implied covenant of good faith and fair dealing cannot directly contradict an express contract term. *See Scheck v. Burger King Corp.*, 798 F.Supp. 692, 697 (S.D.Fla.1992)("the covenant of good faith and fair dealing will not be implied in contradiction of an express contractual provision"); *Zygar v. Johnson*, 169 Or.App. 638, 10 P.3d 326, 330 (2000)( "the implied covenant [of good faith and fair dealing] cannot contradict an express contractual term."); *Third Story Music, Inc. v. Waits*, 41 Cal.App.4th 798, 48 Cal.Rptr.2d 747, 753 (1995)("no [covenant of good faith and fair dealing] can be implied ... which would result * * * in the obliteration of a right expressly given under a written contract")(quoting *Gerdlund v. Elec. Dispensers Int'l*, 190 Cal.App.3d 263, 235 Cal.Rptr. 279 (1987)); *Idaho First Nat'l Bank v. David Steed & Assocs.*, 121 Idaho 356, 825 P.2d 79, 83 (1992)(implied covenant of good faith and fair dealing cannot contradict express terms in contract). However, "[i]nstances

9

inevitably arise where one party exercises discretion retained or unforeclosed under a contract in such a way as to deny the other a reasonably expected benefit of the bargain." *Wells Fargo Bank*, 201 Ariz. 474, 492 ¶ 66, 38 P.3d 12, 30 (quoting *Southwest Sav. & Loan v. SunAmp Sys.*, 172 Ariz. 553, 558, 838 P.2d 1314, 1319 (App.1992)). [Footnote omitted.] Thus, Arizona law recognizes that a party can breach the implied covenant of good faith and fair dealing both by exercising express discretion in a way inconsistent with a party's reasonable expectations and by acting in ways not expressly excluded by the contract's terms but which nevertheless bear adversely on the party's reasonably expected benefits of the bargain. *See id.* at ¶ 67.

*See also United Dairymen of Arizona v. Schugg*, 212 Ariz. 133, 137-138, ¶ 15, 128 P.3d 756, 760-761(App. 2006) ("All contracts as a matter of law include the implied duties of good faith and fair dealing, and contract damages are available for their breach. [Citations omitted.] A party can breach the implied covenant of good faith and fair dealing without breaching an express provision of the underlying contract. [Citations omitted.]")

Both parties retained considerable discretion regarding how they exercised their rights over Dunna. Consistent with the covenant of good faith and fair dealing, Plaintiffs had an obligation to not impair Breeders' right to breed Dunna. Breeders had an obligation to not impair Plaintiffs' ownership or possessory right to Dunna.

Plaintiffs knew of Breeders' concern over having intact male dogs around Dunna. Plaintiffs led Breeders to reasonably believe that Plaintiffs either would have Red Dog neutered or take reasonable steps to keep Dunna separated from any intact male dog when Dunna was in heat. Plaintiffs failed to do either. Mr. Douglas refused to have Red Dog neutered, but that decision was not conveyed to Breeders until March 3, 2008. Because the one mature female (Einey) had quickly been removed from Plaintiffs' care, the issue of neutering Plaintiffs' male dogs seems to have become less immediate until Rhonda was advised that Dunna was in heat. The issue then resurfaced in the email exchange on March 3, 2008 between Rhonda and Stephanie. Stephanie assured Rhonda that Red Dog was too ill to mate with Dunna and, in addition, Dunna and Slipper were being kept in a locked area. While Plaintiffs attempted to keep Dunna in the pool area and away from Red Dog, the efforts were unsuccessful, primarily because the pool area gate was not locked thus allowing access to the area by the many construction workers present on the property. As a result, Dunna was impregnated by Red Dog after Dunna escaped when a tile worker opened the unlocked gate. Dunna was approximately fifteen months old at the time. Plaintiffs' conduct was inconsistent with Breeders' reasonable expectation that Breeders' breeding rights would not be adversely impacted while Dunna was in Plaintiffs' care.

In *West Pinal Family Health Center, Inc. v. McBryde*, 162 Ariz. 546, 548, 785 P.2d 66, 68 (App. 1989), the court wrote:

Upon the breach of a contract, the party seeking relief has the choice of three remedies: rescind the contract, refuse to treat the breach as a termination of the contract and request that the court compel performance under the contract, or consider the breach to be a termination of the contract and request damages resulting from the breach.

10

*See also County of La Paz v. Yakima Compost Co., Inc.*, 224 Ariz. 590, 233 P.3d 1169, ¶ 62 (App. 2010)

The Court is of the opinion that Plaintiffs' breach of the implied covenant of good faith and fair dealing in failing either to have Red Dog neutered or to keep the pool gate locked when Dunna was in heat was a material breach entitling Breeders to terminate the "Pet Lease Sales Contract." Plaintiffs' refusal to neuter Red Dog or to securely sequester Dunna when in heat placed Breeders' breeding rights at jeopardy. One accidental litter had already occurred by January 20, 2009. If Dunna had been returned to Plaintiffs, Breeders had no assurance that additional accidental litters would not have occurred. While the number is in dispute, a breeding bitch is capable of having a limited number of litters. By failing to take reasonable steps to prevent an accidental pregnancy, Plaintiffs created a situation where Breeders' limited litter opportunities were placed at substantial risk. In the absence of neutering Red Dog or locking the pool gate, Plaintiffs could not reasonably assure Breeders that Dunna would not come into contact with an intact male dog during one of Dunna's heats. Both Plaintiffs were employed outside the household. During the previous eight to ten years, Plaintiffs' home had been undergoing a major remodel with numerous trades-people coming and going from the property. Although he did not disclose it to Plaintiffs, Mr. Michael Tucker, Plaintiffs' general contractor, testified that the dogs had escaped three times from the pool area, the third time resulting in the accidental pregnancy. Therefore, the Court concludes as a matter of law that Breeders were entitled to terminate the Pet Lease Sales Contract effective January 20, 2009. Accordingly, Breeders had no legal obligation to return Dunna to Plaintiffs after that date.

Plaintiffs also breached an express term of the Pet Lease Sales Contract. Breeders retained the breeding right and ownership of all puppies of Dunna. The contract provides that "All of the puppies produced by any future breeding will be owned by the Breeders alone." The breeding of Dunna with Red Dog qualifies as "any future breeding." Therefore, the four mixed breed puppies belonged to Breeders. By not timely informing Breeders of the accidental pregnancy and not giving the puppies to Breeders, Plaintiffs breached the contract. The mixed bred puppies had no value; therefore, Breeders are not awarded damages for those puppies.

As a result of Plaintiffs' breach of the contract, Breeders claim that they are entitled to the value of a litter of purebred Portuguese Water Dogs. As noted above, there is a dispute over how many litters a purebred Portuguese Water Dog bitch may safely have, but the credible evidence is that the number is limited. What we do know is that Dunna was capable of having three litters. Because of the accidental pregnancy, Dunna's litter capacity was reduced by one. Thus, Breeders lost the opportunity to have a litter of purebred Portuguese Water Dogs as a result of the accidental pregnancy.

Plaintiffs contend that if Breeders had not lost Dunna, Breeders could have mitigated their damages by having bred Dunna a fourth time. Even if Dunna had had a fourth, fifth or even sixth litter of puppies, Breeders still would have lost the opportunity to have one additional litter. In other words, additional litters would never make up the one lost as a result

11

of Plaintiffs' breach. In addition, as noted above, Dunna was not able to have more than three litters.

Marilyn Rimmer testified that she sells her puppies for $2,200.00 each. Rhonda testified that the typical litter is ten puppies with one or two selling for $2,900.00 each and the rest for $2,400.00 each. Mary Goodman placed the value of a litter of Portuguese Water Dogs at $34,000.00 to $36,000.00 assuming eight to ten puppies with two breed stock quality puppies being retained by the breeder. A significant portion of Ms. Goodman's value estimate is what she described as "blue sky," or future profits resulting from breeding. As noted during closing arguments, the Court finds the "blue sky" profit component to be pure speculation. Ms. Goodman placed the average sales price of a puppy at $2,200.00 to $2,400.00. Mr. Klump testified that Dunna's puppies had sold for $2,000.00 each with one selling for $500.00 because of a "miscoat." Assuming a litter of eight puppies selling for $2,000.00 per puppy and offsetting a reasonable amount to care for the puppies and ready them for sale, the Court finds and concludes that the value of the opportunity lost by Breeders to have a third litter of purebred Portuguese Water Dogs is $15,000.00.

**D.** **Did Stephanie agree to neuter their male dogs? If so what impact does that failure to neuter the dogs have on the claims presented in this case?**

Breeders contend that they had a separate agreement with Plaintiffs whereby Stephanie agreed to have the male dogs neutered on November 11, 2007. *See* Exhibit 25, p. 2. Stephanie testified that she did not initial the alleged agreement. The Court is of the opinion that it need not decide whether a separate agreement was reached because, as discussed above, the Court has found that Plaintiffs breached the implied covenant of good faith and fair dealing by failing to take reasonable steps to protect Dunna from contact with Plaintiffs' intact male dogs.

**E.** **Did Stephanie provide adequate evidence to Breeders that Slipper had been spayed? If not, what impact does the failure to provide adequate evidence of spaying have on the claims presented in this case?**

The "Puppy Sales Pet Contract" provides:

You enjoy ownership but AKC papers will be held in the Breeders name until such time as the dog is spayed or neutered. After a copy of the certificate for sterilization is sent to the Breeders, they will sign the dog over, then the AKC papers will be re-issued in your name as owner.

In Plaintiffs' Complaint dated February 23, 2009, one of the requested prayers for relief is "[f]or the turnover of their dogs' AKC papers." A "Spay Certificate" signed by Dr. Wood was provided to Plaintiffs on February 6, 2009. *See* Exhibit 1, p. 35. That certificate was provided to Breeders. Prior to that, Breeders had been given access to Slipper's vet records. The Court finds and concludes that Breeders unreasonably withheld the AKC registration papers until the third day of the trial and thereby breached an express term of the

12

"Puppy Sales Pet Contract." Plaintiffs had no plans to either show or breed Slipper and had her spayed. Under the circumstances, not having the AKC registration papers did not cause Plaintiffs any direct damage. However, in order to obtain the AKC registration papers for Slipper, Plaintiffs had to prosecute this case. That factor has been considered in determining the amount of attorney's fees awarded to Breeders.

**F.** **Is either party entitled to recover their reasonable attorney's fees in accordance with the terms of the Pet Lease Sales Contract or under a breach of contract theory?**

The Court is of the opinion that Breeders are the successful parties. While the Court has found that Breeders wrongfully retained Slipper for nine days and breached the contract by unreasonably withholding the AKC papers, Breeders sustained the greater amount of damages as a result of Plaintiffs' breach of the Pet Lease Sales Contract. The Pet Lease Sales Contract contains a fee award provision running in favor of Defendants. Although the fee provision provides that Defendants are entitled to recover "all attorney's fees," the Court construes that provision to mean that Defendants are entitled to recover all reasonable attorney's fees. In addition, the Court finds that Defendants are the successful parties for purposes of A.R.S. §12-341.01.

In determining what constitutes a reasonable amount of attorney's fees, the Court has reviewed Mr. Swift's fee affidavit and considered the factors summarized in Plaintiffs' response on pages 12 through 16. The Court has reduced Defendants' fee request because Defendants acted unreasonably and unnecessarily expanded the litigation over the issue of the AKC registration papers for Slipper.

Therefore,

**IT IS HEREBY ORDERED** granting judgment in favor of Counterclaimants, Rhonda Maytas, Daniel Matyas and Robert Klump, and against Counterdefendants, Carl James Douglas and Stephanie Jordan, jointly and severally and their marital community on Count I of the Counterclaim in the principal amount of $13,000.00 plus reasonable attorney's fees in the amount of $24,960.00 and taxable court costs in the amount of $2,278.34, for a total judgment of $40,238.34 with interest on that amount from the date of this judgment at the rate of ten percent per annum until the judgment is paid in full.

Having offset Plaintiffs' conversion claim damages against Breeders' breach of contract claim damages,

**IT IS FURTHER ORDERED** granting judgment in favor of Defendants, Rhonda Maytas, Daniel Matyas and Robert Klump, and against Plaintiffs, Carl James Douglas and Stephanie Jordan, on Plaintiffs' Complaint with Plaintiffs to take nothing further thereby.

DATED this 5TH day of August, 2011.

_____
Hon. Gary E. Donahoe

13

1   Original filed with the Clerk of the Court
2   and copy mailed to:

3
    Mr. David A. Fitzgibbons
4   Fitzgibbons Law Offices, PLC
    PO Box 11208
5   Casa Grande, AZ 85230-1208

6   Mr. Thomas N. Swift
    Thomas N. Swift II, PC
7   2345 S. Alma School Rd, Suite 104
    Mesa, AZ 85210-4013
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22          The foregoing instrument is a full, true and correct copy of
23          the original on file in this office.

24          Attest
            MICHAEL K. JEANES, Clerk of the Superior Court of the
25          State of Arizona in and for the County of Maricopa

            By _____ Deputy

            14

Finally, Plaintiffs argue that the agreement to allow Judge Donahoe to circulate a draft opinion if there were no post-trial motions would include a Motion for Sanctions under Rule 68(g). The Court finds this argument unpersuasive, as post-trial motions would include a Rule 59 Motion for New Trial or Motion to Alter or Amend Judgment, and a Rule 60 Motion for Relief from Judgment.

Since the Motion for Sanctions does not go to the validity of the Judgment itself, the Court does not interpret it as a "post-trial motion" as referred to by Judge Donahoe in the agreement. It appears that since Judge Donahoe allowed the parties input into the language of the Judgment, he did not want either party to then be able to attack the Judgment post-trial.

For the reasons stated,

**IT IS ORDERED** granting the Motion for Sanctions under Rule 68(g), and awarding Defendants/Counterclaimants reasonable expert witness fees in the amount of $5,324.46 and double taxable costs in the amount of $216.00.

**IT IS FURTHER ORDERED** awarding prejudgment interest from November 16, 2010 on the principal sum of $13,000.00 at the rate of ten percent (10%) per annum. *954.08*

ALERT: Effective September 1, 2011, the Arizona Supreme Court Administrative Order 2011-87 directs the Clerk's Office not to accept paper filings from attorneys in civil cases. Civil cases must still be initiated on paper; however, subsequent documents must be eFiled through AZTurboCourt unless an exception defined in the Administrative Order applies.

*Demand of*
*Payment of*
*AWARD*
*SANCTIONS*

```
        0·00  ⊤
      954·08  +
    5,324·46  +
      216·00  +
      700·00  +
    7,194·54  ⊤
```

| Less Offer of Judgment | (20,500.00) |
|---|---|
| Amount by which judgment exceeded offer | 7,727.14 |

The Court applies the method of calculation set forth by Division 2 in *Hales v. Humana*, 186 Ariz. 375; 923 P.2d 841 (Div. 2, 1996), rather than the method offered by Breeders, but using Breeders numbers.

| Offer of Judgment (Inclusive) | $20,500.00 |
|---|---|
| Less Attorneys fees as of date of offer | (13,164.00) |
| Less costs as of date of offer | ( 2,278.34) |
| Net Offer | 5,273.66 |

The parties agree that the net Judgment is $13,000.00.

Applying the method of calculation set forth in *Hales* to the numbers offered by Breeders, the calculation of net Judgment is $13,000.00 and the calculation of the net Offer is $5,273.66. The net Judgment exceeds the net Offer of Judgment by $7,726.34.

By either method of calculation, the net Judgment exceeds the net Offer of Judgment.

Therefore, using Breeders numbers, both by Breeders calculations, and by the *Hales* calculation, sanctions are appropriate in this matter because the net Judgment exceeds the net Offer of Judgment.

Plaintiffs argue that the calculation should be made by taking into account all attorneys fees and costs awarded, not just those as of the date of the Offer of Judgment. This argument is based on the Offer of Judgment which was $20,500 "inclusive of taxable court costs, interest, and attorneys fees sought in the case." However Rule 68(a) includes that exact language, and the Court, in *Hales*, interpreted the same type of language. Therefore, Plaintiffs' analysis that all costs and attorneys fees should be included in the calculation is incorrect.

Plaintiffs also include prejudgment interest in their calculation. However, since the damage claims were unliquidated, no prejudgment interest should be included.

Case 4:17-bk-01945-BMW    Doc 106    Filed 05/03/19    Entered 05/06/19 10:48:28    Desc
Main Document    Page 36 of 41

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2009-024481                                            01/14/2013

CLERK OF THE COURT
HONORABLE MICHAEL J. HERROD                               L. Stogsdill
                                                         Deputy

CARL JAMES DOUGLAS, et al.            DAVID A FITZGIBBONS III

v.

RHONDA MATYAS, et al.                 RHONDA MATYAS
                                      DANIEL MATYAS
                                      3827 EAST MARILYN
                                      PHOENIX AZ 85032


                                      ROBERT KLUMP
                                      3827 EAST MARILYN
                                      PHOENIX AZ 85032
                                      STEPHANIE JORDAN
                                      P O BOX 280
                                      COOLIDGE AZ 85128


MINUTE ENTRY

The Court has received Defendants/Counterclaimants' request for payment.

The Court notes that the case resolved by Settlement Agreement, so nothing is pending before the Court.

Defendants/Counterclaimants' should seek enforcement of the Settlement Agreement.

ALERT: The Arizona Supreme Court Administrative Order 2011-140 directs the Clerk's Office not to accept paper filings from attorneys in civil cases. Civil cases must still be initiated on paper; however, subsequent documents must be eFiled through AZTurboCourt unless an exception defined in the Administrative Order applies.

Docket Code 023                  Form V000A                          Page 1

## SETTLEMENT AGREEMENT, WAIVER OF APPEAL RIGHTS AND COVENANT NOT TO ENTER OR EXECUTE UPON JUDGMENT

This Agreement ("Agreement") is entered into this *22* day of September, 2011, by and between the undersigned, **Carl J. Douglas** ("Douglas") and **Stephanie A. Jordan** ("Jordan"), in their capacities as individuals and on behalf of their marital community (with Douglas and Jordan collectively referred to hereinafter as "Plaintiffs"), and **Rhonda Matyas** and **Daniel Matyas**, wife and husband, and **Robert Klump**, a single man (hereinafter "Breeders") (with Plaintiffs and Breeders collectively referred to hereinafter as "the Parties").

### RECITALS

A.     On or about February 23, 2009, Plaintiffs filed a lawsuit against Breeders in the Pinal County Superior Court, subsequently transferred to Maricopa County Superior Court on July 31, 2009, and assigned Case Number CV2009-024481 ("the Litigation").

B.     Ultimately, the Litigation proceeded to trial on May 10, 11 and 12, 2011.

C.     The outcome of the Litigation was a judgment being entered on August 5, 2011 by the trial judge in favor of Breeders and against Plaintiffs, totaling $40,238.34, inclusive of all damages, costs and fees (the "Judgment").

D.     Following entry of the Judgment, Breeders filed a Motion for Sanctions alleging that they are entitled to sanctions consisting of expert witness fees, ($5,324.46), interest ($954.08), double taxing costs ($216.00), which the court granted, plus additional fees after the Motion ($700.00), for a total of $7,194.54 (the "Award").

E.     Plaintiffs believe the trial court made certain errors in its ruling in the Litigation and, therefore, Plaintiffs filed an appeal (the "Appeal").

F.     The Parties hereto desire to settle all matters existing between them arising out of the Litigation and Appeal and, further, the Parties desire to settle the Judgment/Award owed by Plaintiffs to Breeders, including any and all amounts which Plaintiffs may owe to Breeders and to settle any and all claims which the parties may possess against each other, based upon all facts presently known or unknown, discovered or undiscovered, presently in existence or not yet existing.

### AGREEMENT

1.     **Payment.**  Plaintiffs agree to make payment to Breeders as against the Debt presently owed by Plaintiffs to Breeders, in the form of ten monthly wire transfers in the amount of $3,000.00 each month, on the 15th day of each month, with the first wire transfer due on or before 5:00 p.m., three business days after this Agreement is fully executed, to:

Account No. ▮▮▮▮▮▮▮▮▮▮
Bank of America
Mill Creek, WA Branch 98012
Routing No. ▮▮▮▮▮▮▮▮

*Settlement Signed by All parties*

1

payments due Breeders under paragraph 1, *supra*, of this Agreement, Breeders agree to file a Satisfaction of Judgment in the Litigation

11. **Cooperation.** Each party agrees to execute and deliver such further documents and to cooperate as may be necessary to implement and give effect to the provisions contained herein.

12. **Grace Period.** Defendants shall have a forty-eight (48) hour grace period to make any required electronic payments due under this Agreement. In the event the payment is actually received by Breeders by the close of business, 5:00 p.m., on the second and last day of any grace period, the payment will be considered timely. In the event the last day of the grace period falls on a weekend or judicial holiday, the next business day will be considered the last day of the grace period.

13. **Section Headings.** Section headings in this Agreement are for convenience only, and shall not be used in construing the Agreement.

14. **Severability.** A judicial determination that any provision of this Agreement is invalid in whole or in part shall not affect the enforceability of those provisions found to be valid.

15. **Authority to Sign.** Each person signing this Agreement, whether individually or in a representative capacity, hereby represents and warrants that he or she is fully authorized to sign this Agreement on behalf of the individual or entity on whose behalf he or she is signing and that this Agreement is binding upon the individual or entity.

16. **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile counterpart signatures shall be binding.

17. **Applicable Law.** This Agreement shall be construed and interpreted in accordance with the laws of the State of Arizona.

DATED: September 22, 2011.

_____
Carl J. Douglas

_____
Rhonda Matyas

_____
Stephanie A. Jordan

_____
Daniel Matyas

_____
Robert Klump

3

CV 2009-024481                                         09/08/2011

Finally, Plaintiffs argue that the agreement to allow Judge Donahoe to circulate a draft opinion if there were no post-trial motions would include a Motion for Sanctions under Rule 68(g). The Court finds this argument unpersuasive, as post-trial motions would include a Rule 59 Motion for New Trial or Motion to Alter or Amend Judgment, and a Rule 60 Motion for Relief from Judgment.

Since the Motion for Sanctions does not go to the validity of the Judgment itself, the Court does not interpret it as a "post-trial motion" as referred to by Judge Donahoe in the agreement. It appears that since Judge Donahoe allowed the parties input into the language of the Judgment, he did not want either party to then be able to attack the Judgment post-trial.

For the reasons stated,

**IT IS ORDERED** granting the Motion for Sanctions under Rule 68(g), and awarding Defendants/Counterclaimants reasonable expert witness fees in the amount of $5,324.46 and double taxable costs in the amount of $216.00.

**IT IS FURTHER ORDERED** awarding prejudgment interest from November 16, 2010 on the principal sum of $13,000.00 at the rate of ten percent (10%) per annum. *954.08*

ALERT: Effective September 1, 2011, the Arizona Supreme Court Administrative Order 2011-87 directs the Clerk's Office not to accept paper filings from attorneys in civil cases. Civil cases must still be initiated on paper; however, subsequent documents must be eFiled through AZTurboCourt unless an exception defined in the Administrative Order applies.

*Calculations of Award of Sanctions*

```
   0 · 00  T

 954 · 08  +
5,324 · 46  +
 216 · 00  +
 700 · 00  +
7,194 · 54  T
```

Docket Code 023                    Form V000A                         Page 3

| | |
|---|---|
| Less Offer of Judgment | (20,500.00) |
| Amount by which judgment exceeded offer | 7,727.14 |

The Court applies the method of calculation set forth by Division 2 in *Hales v. Humana*, 186 Ariz. 375; 923 P.2d 841 (Div. 2, 1996), rather than the method offered by Breeders, but using Breeders numbers.

| | |
|---|---|
| Offer of Judgment (Inclusive) | $20,500.00 |
| Less Attorneys fees as of date of offer | (13,164.00) |
| Less costs as of date of offer | ( 2.278.34) |
| Net Offer | 5,273.66 |

The parties agree that the net Judgment is $13,000.00.

Applying the method of calculation set forth in *Hales* to the numbers offered by Breeders, the calculation of net Judgment is $13.000.00 and the calculation of the net Offer is $5,273.66. The net Judgment exceeds the net Offer of Judgment by $7,726.34.

By either method of calculation, the net Judgment exceeds the net Offer of Judgment.

Therefore, using Breeders numbers, both by Breeders calculations, and by the *Hales* calculation, sanctions are appropriate in this matter because the net Judgment exceeds the net Offer of Judgment.

Plaintiffs argue that the calculation should be made by taking into account all attorneys fees and costs awarded, not just those as of the date of the Offer of Judgment. This argument is based on the Offer of Judgment which was $20,500 "inclusive of taxable court costs, interest, and attorneys fees sought in the case." However Rule 68(a) includes that exact language, and the Court, in *Hales*, interpreted the same type of language. Therefore, Plaintiffs' analysis that all costs and attorneys fees should be included in the calculation is incorrect.

Plaintiffs also include prejudgment interest in their calculation. However, since the damage claims were unliquidated, no prejudgment interest should be included.